In re **PENSIGNORKAY, INC.,** Debtor.

**Bankruptcy No. 96–17519SR.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 24, 1997.

Kevin Callahan, Office of the U.S. Trustee, Philadelphia, PA.

Pepper, Hamilton & Scheetz, Francis J. Lawall, Philadelphia, PA.

Gould & Preziosi, P.C., David F. Gould, III, Doylestown, PA, for debtor.

## *OPINION*

STEPHEN RASLAVICH, Bankruptcy Judge.

### *Introduction.*

The Court has before it motions filed by creditor LC Associates ("LC") and the United States Trustee ("UST") which alternatively seek to dismiss or convert debtor Pensignorkay, Inc.'s ("Debtor") Chapter 11 bankruptcy case. More specifically, LC seeks: a) dismissal of the Debtor's case pursuant to § 1112(b)(1) and/or (2) of the United States Bankruptcy Code ("Code"), 11 U.S.C. §§ 101–1330; or alternatively, b) conversion of the case to Chapter 7 and relief from the automatic stay under Code § 362(d)(1), (2) and/or (3), or adequate protection under Code § 361; and c) sanctions against Bela Standard Rossman pursuant to Rule 9011 of the Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr.P."). The UST requests the Court to convert or dismiss the case pursuant to Code § 1112(b)(3). Hear-

ings on the motions of LC and the UST were held on October 24 and December 19, 1996, respectively. For the reasons set forth below, the Debtor's case will be dismissed. The request for sanctions, however, will be denied.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over the parties and subject matter of this core proceeding pursuant to 28 U.S.C. §§ 1334 and 157(a), 157(b)(1), (b)(2)(A) and (G).

## BACKGROUND

The facts relevant to the issues raised in the motions of LC and the UST are relatively straight-forward and not in dispute. First, this is a "single asset real estate" case in both the classic sense, *see generally In re Kkemko, Inc.,* 181 B.R. 47, 50 (Bankr. S.D.Ohio 1995) (providing a brief summary of the body of case law involving "single asset real estate" issues prior to the incorporation of the term into the Code under the 1994 amendments), and, as will be discussed more fully *infra,* as statutorily defined under Code § 101(51B). In this regard, the Debtor's only significant asset is a 275 acre tract of undeveloped real property located at 960 Creek Road in Warwick Township, Bucks County, Pennsylvania (the "Property").[1]

The Debtor purchased the Property in 1988 with financing provided by Hill Financial Savings Association ("Hill"). The loan from Hill, in the amount of $3,375,000, was evidenced by a promissory note ("Note"), and was secured by a purchase money mortgage ("Mortgage") on the Property. The Note was guaranteed by both Bela Standard Rossman and Rossman Enterprises, Inc. ("REI").

The Resolution Trust Corporation ("RTC") was eventually appointed as receiver for Hill, thereby replacing it in the transaction with the Debtor.

In July 1989, the Debtor defaulted under the Note by failing to pay the entire unpaid principal balance of the loan and accrued interest which were then due. The Debtor does not dispute that it never made any payments on the loan to the RTC or subsequently to LC. The Debtor steadfastly maintains, however, that it was not obligated to do so under an alleged settlement agreement with the RTC.

On June 30, 1993, the RTC filed a four count complaint against the Debtor, Rossman and REI in the District Court for the Eastern District of Pennsylvania. Fortunately, a complete recitation of the tortured history of that litigation is not relevant to the issues that must be decided by this Court. A brief summary of that litigation, however, is necessary in order to provide the background leading up to the filing of this bankruptcy case. The Court pauses at this juncture to note that despite the arguments of the Debtor to the contrary, prior legal and factual determinations made by the District Court in that litigation are binding in this proceeding under the principles of res judicata and collateral estoppel despite the filing of an appeal by the debtor, unless and until such findings are overturned. *See generally, In re Kaplan,* 162 B.R. 684, 708–09 (Bankr.E.D.Pa. 1993), *aff'd,* 189 B.R. 882 (E.D.Pa.1995); *accord Webb v. Voirol,* 773 F.2d 208, 211 (8th Cir.1985) (holding that the federal rule is that the pendency of an appeal does not affect the finality of a judgment for res judi-

---

1. In Schedule "B" of its petition, introduced into evidence at the hearing on October 24, 1996 as Exhibit "L-6", the Debtor lists "engineering plans" and "business plans and studies" pertaining to its halted development plan of the Property. The values assigned to the plans are $200,000 and $100,000, respectively. The Debtor also lists a "high production" water well located on the Property as an asset worth $2,000,000. Despite the allegedly high value of the well, a value called into question by LC at the hearing, *see* Exhibit "L-14" (letter from counsel for the Warwick Township Water and Sewer Authority offering to pay the Debtor $5,760 for the well and a small plot of surrounding land in a public taking proceeding), the principal of the Debtor—Bela Standard Rossman—testified at the October 24, 1996, hearing that the well was not in production at the time that the Debtor acquired the Property in 1988, nor had it been put into service by the Debtor as an income generating asset at any time since then. Transcript, pp. 84–87. Thus, while the well obviously has potential value independent of the Property, e.g., Exhibit "L-14" (as will be discussed *infra,* the value need not be precisely quantified at this time), it is uncontested, however, that the well, like the Property of which it is a part, remains substantially undeveloped by the Debtor.

cata or collateral estoppel purposes). Turning, therefore, to the factual and procedural history of the District Court litigation, it appears that on June 17, 1994, the Debtor filed a motion to enforce the alleged settlement agreement with the RTC. In an Opinion and separate Order issued on November 2, 1994, Judge Gawthrop of the District Court denied the motion, determining that the parties had never entered into a binding agreement settling the litigation. The Debtor's appeal of this ruling was dismissed by the Third Circuit Court of Appeals.

On August 15, 1994, the RTC assigned the Note, Mortgage and guarantees to LC which was then substituted for the RTC in the pending District Court action. On January 17, 1995, LC filed an amended motion for partial summary judgment. In its response, filed on October 16, 1995—after being allowed a generous amount of extra time in which to respond—the Debtor resurrected the settlement agreement argument, this time producing for the first time an unsigned file copy of a draft "Forbearance and Settlement Agreement" that had allegedly been misplaced in defendant Rossman's files. For the second time in the District Court litigation, Judge Gawthrop ruled that an enforceable settlement agreement had not been entered into by the parties. By Order dated November 9, 1995 the court granted the motion, awarding LC judgement in the amount of $5,236,297.31, plus accrued interest.[2]

Thereafter, the defendants sought reconsideration of the Order granting summary judgment. Attached to the reconsideration motion was an affidavit by Sharon Rossman, defendant Rossman's sister and a former officer of the Debtor, in which it was alleged that the Forbearance and Settlement Agreement had been negotiated with one Steven Woods of the RTC, a different individual than had been alleged by the Debtor in its response to the summary judgment motion. The motion was denied in an Order entered on April 2, 1996. In the Opinion accompanying that Order, Judge Gawthrop found, *inter alia*, that the Sharon Rossman affidavit was

presented in bad faith solely for the purpose of delay. Based on this, the court entered judgment in favor of LC against Rossman and attorney David Gould, jointly and severally, for attorneys' fees in the amount of $7,025. By Order dated June 27, 1996, Judge Gawthrop denied the defendants' motion for reconsideration of the April 2, 1996 Order. At the hearing before this Court on October 24, 1996, Debtor's counsel stated that both the November 9, 1995 Order granting summary judgment and the April 2, 1996 Order imposing sanctions, are on appeal before the Third Circuit.

Shortly thereafter, on August 8, 1996, the Debtor filed the petition commencing this Chapter 11 case. The Debtor did not appear at, nor request a continuance of, the Code § 341 first meeting of creditors that was convened on November 13, 1996. At the hearing held on December 19, 1996, the Debtor offered no explanation for its failure to attend the Code § 341 meeting. The 90th day after the filing of the case was November 6, 1996. As of that date, the Debtor had filed neither its Chapter 11 plan nor a request for an extension of the time for doing so.

On September 13, 1996, LC filed the instant motion requesting dismissal of the Debtor's case pursuant to Code § 1112(b)(1) and/or (2), or alternatively, conversion to Chapter 7 and relief from the automatic stay under Code § 362(d)(1) and/or (2), or adequate protection under Code § 361. LC also requested sanctions against Bela Standard Rossman pursuant to Fed.R.Bankr.P. 9011 on grounds that the bankruptcy case had been filed in bad faith and for no purpose other than to further delay LC in the enforcement of its rights against the Property. On November 20, 1996, the UST filed a motion seeking conversion or dismissal of the case under Code § 1112(b)(3) on the basis that the Debtor's failure to appear at the Code § 341 first meeting of creditors that was held on November 13, 1996, and its delay in filing certain required documents in the case constitute unreasonable delay that is prejudicial to creditors. Hearings on the

---

2. At the hearing on October 24, 1996, Ted Mignatti, president of General Land Partners, Inc. (the general partner of LC), testified that as of the petition date, the amount owed under the District Court judgment had grown to approximately $6,700,000. Transcript, p. 13.

motions of LC and the UST were held on October 24 and December 19, 1996, respectively.

At the December 19, 1996 hearing, LC argued that during the time since it had originally filed its motion, the period during which a single asset real estate debtor must file its Chapter 11 plan had expired, and that accordingly, the automatic stay must be lifted in its favor pursuant to Code § 362(d)(3). The Debtor responded to this by arguing that it was not subject to the expedited time frames set forth in Code § 362(d)(3) because the aggregate amount of secured claims in the case exceeded the $4,000,000 debt limitation applicable to this provision. Code § 101(51B). LC countered by arguing that the aggregate amount of the secured claims in a case is to be determined by reference to the value of the collateral securing those claims. Further, since the parties had stipulated that the Property was worth $1,300,000, the debt limitation had not been reached, and that accordingly, relief from the automatic stay under Code § 362(d)(3) was imminently warranted. LC added, that because this is a single asset real estate case, dismissal of the case would be an appropriate course of action since the automatic stay would otherwise have to be lifted in its favor.

## DISCUSSION

### I.

■ Pursuant to Code § 1112(b), a Chapter 11 case may be dismissed or converted to Chapter 7, whichever is in the best interest of creditors and the estate, for "cause". Cause in this sense includes "continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation", 11 U.S.C. § 1112(b)(1), the "inability to effectuate a plan", 11 U.S.C. § 1112(b)(2), or "unreasonable delay by the debtor that is prejudicial to creditors". 11 U.S.C. § 1112(b)(3).

■ On a motion brought pursuant to Code § 1112(b), the burden is on the movant to establish by a preponderance of the evidence that cause justifying either conversion or dismissal of the case exists. *In re Ransom*, 191 B.R. 720, 722 (Bankr.N.D.Ill.1995); *In re Mechanical Maintenance, Inc.*, 128

B.R. 382, 386 (E.D.Pa.1991). Once sufficient cause has been found, the court must determine which of these two alternatives is in the best interest of creditors and the estate. *In re Shockley*, 197 B.R. 677, 679 (Bankr. D.Mont.1996); *In re Mechanical Maintenance, Inc.*, 128 B.R. at 386. In no event, however, is relief mandatory under Code § 1112(b). Rather, the determination of whether to dismiss or convert a case, or even to deny the request for such relief altogether, lies within the discretion of the court. *See e.g.*, *In re Shockley*, 197 B.R. at 679–80; 5 Collier on Bankruptcy ¶ 1112.03[2][d] (15th ed. 1996).

■ Under Code § 1112(b)(2) a court may dismiss or convert a Chapter 11 case if it determines that it is unreasonable to expect that a plan can be confirmed. *See In re Ransom*, 191 B.R. at 722; 5 Collier on Bankruptcy at ¶ 1112.03[2][d][ii]. Such is the case here. As will be discussed *infra*, LC has established that circumstances warranting the granting of relief from the automatic stay under Code § 362(d)(3) are present in this case. Thus, even if the Court were merely to convert rather than dismiss the Debtor's case, the Court would nonetheless still be constrained to lift the automatic stay under Code § 362(d)(3) as alternatively requested by LC. *In re LDN Corp.*, 191 B.R. 320, 327 (Bankr.E.D.Va.1996) (relief under Code § 362(d)(3) is mandatory in single asset realty cases where the provisions of the statute have not been complied with); *accord In re CBJ Development, Inc.*, 202 B.R. 467, 470 (9th Cir. BAP 1996). Since this is a single asset real estate case, once the stay is lifted to allow LC to proceed to foreclose its security interest in the Property, the Debtor will essentially be left without means even to formulate a Chapter 11 plan. The Debtor's inability to confirm and thereafter effectuate a plan under these circumstances provides sufficient cause for dismissal under Code § 1112(b)(2). *See In re Ransom*, 191 B.R. at 722; *In re Cadwell's Corners Partnership*, 174 B.R. 744, 762–63 (Bankr.N.D.Ill.1994).

■ The Court also observes that along with the loss of the Property in this single asset realty case goes any hope that the Debtor could possibly reorganize or rehabili-

tate its finances. This factor, in conjunction with the continued existence of unpaid real estate taxes and mounting tax liens against the Property (Transcript, p. 83–84)—which constitute a source of continuing loss to or diminution of the estate, provides additional cause for dismissal under Code § 1112(b)(1). *See In re Hinchliffe,* 164 B.R. 45, 52 (Bankr. E.D.Pa.1994). The Court further notes that the Debtor's failure to appear at the scheduled Code § 341 meeting of creditors held on November 13, 1996, as well as its tardiness in complying with United States Trustee guidelines requiring the filing of an initial report of operations and monthly reports of operations thereafter, in conjunction with the sheer unlikelihood that the Debtor will be able to propose a confirmable plan, constitute unreasonable delay that is not only wasteful of both the time and resources of the Court and the UST, but is also prejudicial to creditors. *See In re Cannon,* 143 B.R. 805 (Bankr.W.D.N.Y.1992). Thus, additional cause for dismissal exists under Code § 1112(b)(3). *Id.; In re Bresler,* 119 B.R. 400, 404–05 (Bankr.E.D.N.Y.1990). Based on the foregoing, the Court finds that the continued pendency of the case beyond this point would be of no further benefit to creditors or the estate. Accordingly, dismissal of the case pursuant to Code § 1112(b), as opposed to conversion to Chapter 7, is warranted.

## II.

As discussed *supra,* even if the Court were to convert the case to Chapter 7 rather than dismiss it altogether under Code § 1112(b), relief from the automatic stay in favor of LC is warranted under Code § 362(d)(3). As this Court previously observed in *In re Philmont Development Co.,* 181 B.R. 220 (Bankr. E.D.Pa.1995), Code § 362(d)(3) was added to the Code under the Bankruptcy Reform Act of 1994. In pertinent part, Code § 362(d)(3), reads as follows:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> . . . .
>
> (3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless not later than the date that is 90 days after the entry of the order for relief (or such date as the court may determine for cause by order entered within that 90–day period)—
>
>> (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time. . . .

■ The key term "single asset real estate" in Code § 362(d)(3) is defined by Code § 101(51B) which was also added to the Code as part of the 1994 amendments. This provision states, in pertinent part, that:

> 'single asset real estate' means real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto having aggregate non-contingent, liquidated secured debts ·in an amount no more than $4,000,000.

In *Philmont Development* the Court observed that Code § 101(51B) enumerates four criteria that must satisfied before real property can be considered single asset real estate for purposes of Code § 362(d)(3). 181 B.R. at 223. These criteria are: (1) the subject real property must constitute a "single property or project", other than residential real property with fewer than four residential units; (2) the real property must generate substantially all of the income of the debtor; (3) the debtor must not be involved in any substantial business on the real property other than the operation of such property; and (4) the debtor's aggregate non-contingent, liquidated secured debt must be less than $4,000,000 in amount. *Id.*

The first three of the foregoing criteria are satisfied in this case. First, the Property, a tract of undeveloped land consisting of two

adjacent parcels of real property, *see* Exhibit "L–10", that the Debtor acquired with the intention of creating subdivided parcels suitable for building and development, Transcript, p. 34, constitutes a "single property or project" within meaning of the statute. *See In re the McGreals,* 201 B.R. 736, 742–43 (Bankr.E.D.Pa.1996); *In re Philmont Development,* 181 B.R. at 223–24. Next, the fact that the real property is currently undeveloped and not generating any income for the Debtor is of little consequence for purposes of the inquiry here, since the Court is satisfied that Congress did not intend to excuse from compliance with the revised statute the class of debtors who hold undeveloped tracts of land for future development. *In re Oceanside Mission Associates,* 192 B.R. 232, 234–

36 (Bankr.S.D.Cal.1996); *In re Kkemko, Inc.,* 181 B.R. 47, 51 (Bankr.S.D.Ohio 1995). The third factor is also satisfied here since clearly the Debtor is not currently involved in any business activity on the Property other than its ownership of the realty.

 It is only with respect to the applicability of the fourth factor that the Debtor appears to take issue, since at the hearing held on December 19, 1996, it argued only that the expedited bankruptcy procedures provided for in Code § 362(d)(3) did not apply to it because it had listed secured debts far in excess of the $4,000,000 limitation set forth in Code § 101(51B).[3] The Debtor did not provide citation to any authority in support of this position.[4]

3. The Debtor's Schedule "D" lists claims secured by liens against the Property in the aggregate amount of $5,115,000.

4. The Court's own research, however, has revealed two recent opinions that support the position advanced by the Debtor. These are: *In re Oceanside Mission Associates,* 192 B.R. at 236–38 and *In re Standard Mill Ltd. Partnership,* 1996 WL 521190 (Bankr.D.Minn.1996). Of these, the *Standard Mill* court provides no independent reasoning in support of the position, but rather states its general agreement with the holding in the *Oceanside Mission* case. While this Court generally agrees with the holding of the *Oceanside* court on the issue of whether Code § 362(d)(3) is applicable to debtors holding raw land, 192 B.R. at 234–36, it nonetheless respectfully disagrees with that court's position on how to determine the aggregate amount of a debtor's secured debts for purposes of Code § 101(51B).

*Oceanside Mission,* holds, *inter alia,* that the phrase "aggregate non-contingent, liquidated secured debts in an amount no more than $4,000,-000" refers to the total amount of all secured claims without regard to the value of the property securing such claims. *Id.* at 238. The court reaches this conclusion, in part, on the basis that a determination dependent upon a valuation of the collateral under Code § 506(a) could lead to undue delay in the very class of cases that Congress had targeted to receive expeditious treatment under Code § 362(d)(3). *Id.* at 238. While this Court is of course no less concerned about undue delay in single asset realty cases than is the *Oceanside Mission* court, it is by no means a forgone conclusion, however, that delay will necessarily result from an inquiry into the value of collateral. By way of example, there was no such delay in this case. At the hearing on October 24, 1996, the parties stipulated that the Property was worth $1,300,000. Based on the Court's own experiences, there is no reason to

believe that this case is in any way unique in this regard.

Moreover, issues concerning the valuation of property securing claims against the debtor are oft times implicated even at the earliest stages of a bankruptcy case. For example, a request for the use of cash collateral under Code § 363, or even a request for relief from the automatic stay under Code § 362(d)(1), could require a determination of the value of property for purposes of determining whether adequate protection under Code § 361 is needed. Even a request for relief from the stay under Code § 362(d)(2) early on in a case could require a determination of the value of property. E.g., Code § 362(d)(2)(A) (requiring a determination of whether the debtor lacks equity in the subject property). Other examples of Code provisions that could implicate property valuation issues early in a bankruptcy case include, but are not limited to, Code §§ 109(e) (determining a debtor's eligibility for protection under Chapter 13) and Code § 364 (requests to obtain credit). Courts facing all of the foregoing issues must invariably turn to Code § 506(a) when it comes to determining the value of property. The fact that a case might arguably be a single asset real estate case is no exception.

The other major concern expressed by the *Oceanside* court is the potential for prejudice to debtors that mistakenly, but in good faith, believe their property to be worth more than $4,000,000. Such debtors, the court posits, might inadvertently miss the 90 day deadline for filing a plan. 192 B.R. at 238. This Court believes that the best way to prevent such an unfortunate occurrence from happening in the first place is for the courts to interpret and apply related Bankruptcy Code provisions in a consistent and predictable manner so that the parties appearing before them will be on notice as to what is expected of them. With regard to the hypothetical posited by the *Oceanside* court, this means that in determining the aggregate amount of secured debts for

Although the term "secured debts" as used in Code § 101(51B) is not expressly defined by the Code, well established principles of statutory construction provide that its meaning may be divined by reference to other provisions of the statute. *See e.g. Matter of Merchants Grain, Inc. by and through Mahern,* 93 F.3d 1347 (7th Cir.1996) (restating the oft repeated maxim of statutory construction that "identical words used in different parts of the same act are intended to have the same meaning." (quoting *Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 433, 52 S.Ct. 607, 609, 76 L.Ed. 1204 (1932)). In this regard, the Court observes that the word "debt" is defined by the Code to mean "liability on a claim". Code § 101(12). Moreover, the word "claim" is defined to mean, *inter alia,* "right to payment". Code § 101(5)(A). The Court further notes that the United States Supreme Court has held that the terms "debt" and "claim" were intended by Congress to be coextensive. *Pennsylvania Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 557–58, 110 S.Ct. 2126, 2130–31, 109 L.Ed.2d 588 (1990);[5] *see also* H.R.Rep. No. 95–595, p. 310 (1977); S.Rep. No. 95–989, p. 23 (1978); *reprinted in* U.S.Code Cong. & Admin.News 1978, p. 5787. Thus, whereas a creditor has a "claim" against the debtor; the debtor, in turn, owes a "debt" to the creditor. *In re Rifkin,* 124 B.R. 626, 628 (Bankr.E.D.N.Y. 1991). Stated another way, a debt and claim are essentially "flip sides of the same coin." *Id.* The terms "secured debt" and "secured claim", therefore, are similarly related. *Accord Branch Banking & Trust Co. v. Russell,* 188 B.R. 542, 543–44 (E.D.N.C.1995).

Pursuant to code § 506(a), the allowed claim of a creditor holding a lien on property of the estate is a secured claim only "to the extent of the value of such creditor's interest in the estate's interest in such property ...,

and is an unsecured claim to the extent that the value of such creditors interest ... is less than the amount of such allowed claim." Thus, the determination of the extent to which a claim, or in this case a "debt", is secured, depends on the value of the collateral to which the creditor's lien attaches. Code § 506(a); *see generally Branch Banking & Trust Co. v. Russell,* 188 B.R. at 543–44; *In re Rifkin,* 124 B.R. at 628. Here, it has been stipulated that the Property is worth $1,300,-000. Exhibit "L–7". Thus, the $4,000,000 secured debt limitation provided in Code § 101(51B) has not been reached.[6] Accordingly, all of the criteria enumerated under Code § 101(51B) are satisfied here. Since, the Debtor did not file a Chapter 11 plan within 90 days after the filing of its petition, LC is entitled to relief from the automatic stay pursuant to Code § 362(d)(3). *In re LDN Corp.,* 191 B.R. at 327.

### III.

In light of the foregoing, the Court concludes that movants LC and the UST have satisfied their respective burdens of establishing the existence of cause warranting dismissal of the Debtor's Chapter 11 case pursuant to Code § 1112(b)(1), (2) and (3). Accordingly, the motions of LC and the UST are granted insofar as they request such relief. In light of the dismissal of the Debtor's case at this relatively early stage, however, LC's request for sanctions is denied.

purposes of Code § 101(51B), reference is to be made, as one would expect, to the value of the collateral securing such claim as provided by Code § 506(a).

5. Although the result in *Davenport* was subsequently overruled by statute under the Criminal Victims Protection Act of 1990, Pub.L. 101–581, § 3, 104 Stat. 2865, its holding regarding the definition of the term "claim" remains undis-

turbed. *Johnson v. Home State Bank,* 501 U.S. 78, 83 n. 4, 111 S.Ct. 2150, 2154 n. 4, 115 L.Ed.2d 66 (1991).

6. Even if the value of the well stated in Schedule B ($2,000,000) were to be added to the stipulated value of the Property ($1,300,000), the combined value of both elements would be a maximum of only $3,300,000, still too low to get past the $4,000,000 threshold stated in Code § 101(51B).